UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, GRAPHIC COMMUNICATIONS CONFERENCE, UPPER MIDWEST LOCAL 1-M, | Case No. 09-CV-2868 (PJS/JSM) |
| Plaintiff, | |
| v. | |
| WALTER G. ANDERSON AND ASSOCIATES, INC., a Minnesota Corporation; WALTER G. ANDERSON, INC., a Minnesota Corporation; WALTER G. ANDERSON, INC., a Minnesota Corporation; and WALTER G. ANDERSON PRINTERS-LITHOGRAPHERS, a Minnesota corporation, d/b/a W.G. ANDERSON, INC., | ORDER |
| Defendants. | |
| WALTER G. ANDERSON, INC., a Minnesota Corporation, | |
| Third-Party Plaintiff, | |
| v. | |
| MICHAEL OLLIG, | |
| Third-Party Defendant. | |

Richard A. Williams, Jr., WILLIAMS & IVERSEN, P.A., for plaintiff and third-party defendant.

Mark S. Mathison and Samuel W. Diehl, GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A., for defendants and third-party plaintiff.

WALTER G. ANDERSON, INC. ("WGA"[1]) is a party to a collective-bargaining agreement ("CBA") with the International Brotherhood of Teamsters, Graphic Communications Conference, Upper Midwest Local 1-M (the "Union"). This lawsuit arises out of the firing of Larry Johnson, who was an employee of WGA and a member of the Union. The Union seeks to grieve that firing under the CBA. WGA, however, alleges that a last-chance agreement signed by Johnson and third-party defendant Michael Ollig (who represented the Union at WGA's plant) modifies the CBA and waives the Union's right to grieve Johnson's dismissal. The Union responds that the last-chance agreement is a nullity because Ollig did not have the authority to sign that agreement on behalf of the Union.

The parties dispute these and several other issues, including the preliminary question of whether this Court or an arbitrator must decide whether the last-chance agreement binds the Union. This matter is before the Court on the Union's motion for summary judgment on its claim against WGA and on the Union's motion to dismiss WGA's counterclaim against the Union and third-party complaint against Ollig.[2] For the reasons that follow, the Court grants the Union's motion to dismiss WGA's counterclaim and third-party complaint, and the Court grants in part and denies in part the Union's motion for summary judgment.

---

[1] WALTER G. ANDERSON, INC., does business under the name "W.G. Anderson, Inc." and was formerly known as Walter G. Anderson and Associates, Inc.; Walter G. Anderson, Inc.; and Walter G. Anderson Printers-Lithographers. These entities will be referred to collectively as "WGA."

[2] Ollig joins the Union's motion. For simplicity, the Court will refer to the motion as though it were filed solely by the Union.

In its motion, the Union asks the Court to strike WGA's answer and award the Union its attorney's fees and costs. But the Union did not discuss these requests in its briefing or at oral argument. Because the basis for these requests has not been explained, the Court denies them.

I.  BACKGROUND

WGA employed Johnson in its printing plant in Hamel, Minnesota for over three decades. Counterclaim ¶ 21; Counterclaim Ex. 1 at 1.  Johnson had been disciplined in the past for various infractions.  Counterclaim Ex. 1 at 1.  On November 6, 2008, Johnson committed what WGA describes as "an egregious safety violation."  Counterclaim ¶ 21.  Someone at WGA had decommissioned a high-powered fan by severing its electrical plug.  Counterclaim Ex. 1 at 2. Johnson propped the decommissioned fan precariously on its side and ran the bare wires from the fan's electrical cord directly into a socket on the machine that he was operating.  *Id*.  Based on that act, and on Johnson's record of past discipline, WGA announced on or about November 7, 2008 that it intended to fire Johnson.  Counterclaim ¶ 22.

WGA did not follow through on its intention, however.  Instead, WGA's Dan Petrella and Charles Pittman met with Johnson and Ollig on November 10 and 11, 2008 to discuss Johnson's latest infraction and WGA's decision to fire him.  Counterclaim ¶¶ 23, 25.  Ollig was the "Senior Shop Chair" for the Union at WGA's plant — a position recognized and defined by Article 32 of the CBA.  Williams Aff. Ex. A (hereinafter "CBA"), Art. 32 [Docket No. 8-2].  During their meetings, Petrella, Pittman, Ollig, and Johnson negotiated a last-chance agreement for Johnson. Counterclaim ¶ 26.

As might be surmised from the name, a last-chance agreement is "a contract between employer and employee to suspend disciplinary action pending a probationary period in which the employee is afforded a chance to improve his or her performance."  *Coca-Cola Bottling Co. v. Teamsters Local Union No. 688*, 959 F.2d 1438, 1440 (8th Cir. 1992) (internal quotation omitted).  If, during the probationary period, the employee does not live up to the expectations

set forth in the last-chance agreement, the agreement generally permits the employer to impose the disciplinary action it previously had suspended, without being subject to the grievance procedures of the CBA. *Id.*

Under the terms of Johnson's last-chance agreement, Johnson was not fired, but instead was suspended for ten days. Counterclaim ¶ 27. The last-chance agreement provided that if at any time within the next two years Johnson failed to meet certain job-performance expectations, or violated any company policies, procedures, or rules, he would be subject to immediate dismissal, and he would not have the benefit of the CBA's grievance and arbitration procedures. Counterclaim ¶ 27; Counterclaim Ex. 1 at 3. Pittman, Ollig, and Johnson executed the last-chance agreement on November 11, 2008. Counterclaim ¶ 26; Counterclaim Ex. 1 at 3. Neither the Union nor Johnson grieved or otherwise made any objection to the last-chance agreement at that time. Counterclaim ¶ 30.

In early June 2009, nearly seven months after signing the last-chance agreement, Johnson committed a costly error on a press run. Counterclaim ¶ 31. Based on that error, and on Johnson's prior discipline record, WGA fired him. Counterclaim ¶ 32.

The Union protested the firing. In a letter dated June 10, 2009, the Union argued that, under Article 26 of the CBA, Johnson could not be fired except for "just cause," and that Johnson's error on the press run did not provide "just cause" to fire him. The Union sought to grieve Johnson's termination in accordance with Article 31 of the CBA. Counterclaim ¶ 33; Williams Aff. Ex. B. The Union sent another letter dated the same day, reporting that Johnson had acknowledged that he had made a costly error on the press run, and offering to withdraw the grievance if WGA would demote, rather than fire, Johnson. Counterclaim Ex. 2.

WGA quickly rebuffed the Union's offer. WGA asserted that it did indeed have "just cause" to fire Johnson for purposes of Article 26 of the CBA. More importantly, however, WGA asserted that it did not *need* "just cause" to fire Johnson because, under the terms of the last-chance agreement, Johnson's termination was not subject to the CBA. *See* Williams Aff. Ex. C.

More correspondence followed. The focus of most of that correspondence was a dispute over the status of the last-chance agreement. The dispute — which is now before this Court — can be summarized as follows:

The Union argues that the last-chance agreement was an "individual employment contract[]" for purposes of the CBA and points out that, under Article 1 of the CBA, "[n]o individual employment contracts shall be entered into unless by consent of both [WGA and the Union]." CBA, Art. 1, § 4. The Union further argues that the CBA governed the termination of Union members such as Johnson, and, under Article 35 of the CBA, the CBA could not be modified "except by writing subscribed to by the parties." CBA, Art. 35. Finally, the Union argues that it did not "consent" to the last-chance agreement — and it did not "subscribe[]" to any modification of the CBA — because Ollig, as Senior Shop Chair, did not have the authority to bind the Union. According to the Union, only an officer of the Union could enter such an agreement on the Union's behalf, and Ollig was not an officer of the Union.

In short, then, the Union takes the position that, because the last-chance agreement between WGA and the Union was never signed by someone who had authority to bind the Union, no contract to exempt Johnson's termination from the CBA was ever formed. Johnson's termination was therefore governed by the CBA. He could be fired only for "just cause" — and,

because the Union grieved his firing, an arbitrator must decide the grievance under Article 31 of the CBA.

WGA disagrees. WGA argues that Ollig did, in fact, have authority to bind the Union, and WGA cites Article 32 of the CBA in support of its argument. Section 1 of Article 32 provides that "[i]n every plant there shall be at least one representative of the Union called a 'Senior Shop Chair.'" CBA, Art. 32, § 1. In the WGA plant, of course, the Senior Shop Chair was Ollig. Section 2 of Article 32 continues:

> The Shop Chair shall represent the Union in the plant where he is employed, and shall at all times try to maintain harmonious relations between the employees, the Employer and the Union. The Shop Chair shall bring all disputes to the attention of the foreman or person designated by the Employer to receive such disputes. If satisfaction of the dispute is not accomplished, then an Officer of the Local Union shall be called in.

CBA, Art. 32, § 2.

According to WGA, Article 32 authorized Ollig to act as a "representative of the Union," with authority to negotiate and execute contracts — such as the last-chance agreement — on the Union's behalf. Because Ollig had authority to bind the Union, the last-chance agreement was a valid "individual employment contract[]" for purposes of Article 1 of the CBA because it was entered into with the "consent" of both WGA and the Union. *See* CBA, Art. 1, § 4. Moreover, the last-chance agreement was effective in modifying the CBA under Article 35 because it was a "writing subscribed to by the parties." *See* CBA, Art. 35. Under the terms of the last-chance agreement, WGA did not need "just cause" to fire Johnson, and Johnson's firing was exempt from the grievance procedure set forth in Article 31 of the CBA. *See* CBA, Art. 31, § 1. Based

on this interpretation, WGA contends that the Union has no right to force WGA to arbitrate the grievance over Johnson's termination.

The Union disagrees with WGA's interpretation of the CBA. As the Union reads Article 32, the authority given to shop chairs such as Ollig is limited to "maintain[ing] harmonious relations between the employees, the Employer, and the Union." *See* CBA, Art. 32, § 2. Article 32 does not, in the Union's view, give a shop chair the authority to agree to modifications of the CBA or to consent to individual employment contracts on behalf of the Union.

WGA and the Union not only disagree about whether Ollig had authority to bind the Union when he signed the last-chance agreement, but WGA and the Union also disagree about who must *decide* whether Ollig had authority to bind the Union when he signed the last-chance agreement. The Union contends that the dispute over the scope of Ollig's authority is itself subject to the grievance procedure set forth in Article 31 of the CBA because it is a "dispute" regarding "the interpretation, application or breach of any of the terms contained in this Agreement." CBA, Art. 31, § 1. WGA disagrees, arguing that, because the dispute over the scope of Ollig's authority is in effect a dispute over whether WGA is required to arbitrate the dispute over Johnson's firing, this Court, and not the arbitrator, must determine the scope of Ollig's authority.

After WGA and the Union were unable to resolve their disagreements, the Union brought this action against WGA, seeking an order forcing WGA to arbitrate the grievance over Johnson's termination. Compl. ¶ B. WGA answered and filed a third-party complaint against Ollig, alleging that Ollig committed fraud and negligent misrepresentation in negotiating and

executing the last-chance agreement. Counterclaim Counts I and II. WGA also filed a counterclaim against the Union, seeking to hold it liable for Ollig's actions under the doctrine of respondeat superior. Counterclaim Count III.

The Union now moves for summary judgment on its claim. The Union also moves to dismiss both WGA's counterclaim against the Union and WGA's third-party complaint against Ollig.

## II. ANALYSIS

### A. *Summary Judgment*

#### 1. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

#### 2. Last-Chance Agreement

The parties seem to agree that, if the last-chance agreement did not exist, Johnson could be fired only for "just cause," the Union would have the right to grieve his termination, and WGA would have to arbitrate that grievance. What the parties dispute is whether the last-chance

agreement *does* exist. The Union argues that no contract was ever formed because Ollig did not have authority to bind the Union. WGA disagrees.

The parties not only dispute whether the last-chance agreement exists, but the parties also dispute who must *decide* whether the last-chance agreement exists. The Union argues that an arbitrator must decide that issue. WGA argues that this Court must decide the issue.

The parties agree on one thing: This Court, and not an arbitrator, must decide whether the parties must arbitrate their dispute over the existence of the last-chance agreement. This reflects the fact that the question of whether the parties have agreed to arbitrate a particular dispute — in this case, the dispute over the existence of the last-chance agreement — is a matter of contract law that must be decided by a court. Obviously, if WGA has not agreed to arbitrate the dispute over the existence of the last-chance agreement, WGA cannot be forced to do so. *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960); *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986); *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 208 (1991) ("Whether or not a company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court, and a party cannot be forced to arbitrate the arbitrability question." (internal quotations omitted)).

It is clear to the Court that WGA has, in fact, agreed to arbitrate the dispute over whether the last-chance agreement binds the Union. Whether the Union is bound by the last-chance agreement depends entirely on whether Ollig had authority to sign the last-chance agreement on behalf of the Union — and that, in turn, depends entirely on the meaning of Article 32 (and other provisions) of the CBA. As described above, WGA contends that, in describing Ollig as a "representative of the Union" and in providing that Ollig "shall represent the Union in the

[WGA] plant," Article 32 gave Ollig authority to sign the last-chance agreement on behalf of the Union. The Union disagrees. It argues that Article 32 gave Ollig only authority to "try to maintain harmonious relations between the employees, the Employer and the Union," and that signing contracts was not part of that authority.

Clearly, then, the question of whether the last-chance agreement was formed turns on what Article 32 of the CBA means. Just as clearly, a dispute over the meaning of Article 32 must be arbitrated. In Article 31 of the CBA — which the parties concede is valid and binding — the parties agreed to arbitrate "any dispute with reference to the interpretation . . . of any of the terms contained in [the CBA]. CBA, Art. 31, § 1. The dispute over the scope of Ollig's authority is just such a dispute. It must be arbitrated.

WGA attempts to avoid this conclusion by arguing that, if an arbitrator is permitted to decide whether the last-chance agreement is binding, that arbitrator will *in effect* be permitted to decide whether WGA must arbitrate the dispute over Johnson's firing, and deciding whether the parties agreed to arbitrate the dispute over Johnson's firing is the job of the Court, not an arbitrator. But WGA's argument conflates two different questions: the question of whether the dispute over the existence of the last-chance agreement must be arbitrated, and the question of whether the dispute over Johnson's firing must be arbitrated.

The Court has answered the first question and will order the parties to arbitrate the dispute over the existence of the last-chance agreement. As explained above, that dispute is a dispute over the meaning of the CBA, and disputes over the meaning of the CBA must be arbitrated. *See* CBA, Art. 31, § 1.

The Court has not yet answered the second question. The Court has neither held that the dispute over Johnson's firing must be arbitrated nor held that the dispute over Johnson's firing need not be arbitrated. The Court cannot answer the second question until it learns how the arbitrator has answered the first question. In other words, the Court cannot decide whether the dispute over Johnson's firing must be arbitrated without knowing whether the last-chance agreement binds the Union, and the Court cannot know whether the last-chance agreement binds the Union until an arbitrator decides that question.

After the arbitrator decides what the CBA means — and thus whether Ollig had authority to sign the last-chance agreement on behalf of the Union — either party can ask this Court to decide whether the dispute over Johnson's firing must be arbitrated. Presumably, the decision will be an easy one. If the arbitrator decides that Ollig did not have authority to bind the Union, then the Court will presumably hold that the dispute over Johnson's firing must be arbitrated. If the arbitrator decides that Ollig did have authority to bind the Union, then the Court will presumably hold that the dispute over Johnson's firing need not be arbitrated. But the Court, not the arbitrator, will decide whether the dispute over Johnson's firing is arbitrable.

The bottom line is that the dispute over whether the last-chance agreement binds the Union is a dispute over the meaning of the CBA, and the parties agreed in the CBA to arbitrate all disputes over the meaning of the CBA. True, resolving the dispute over whether the last-chance agreement binds the Union will have a significant impact on the Court's subsequent decision about whether the dispute over Johnson's firing must be arbitrated. But that does not change the fact that the dispute over the scope of Ollig's authority is a dispute over the meaning of the CBA, and under the arbitration clause of the CBA, all such disputes must be arbitrated.

The "side-agreement" cases cited by WGA — in particular, *United Steelworkers v. Duluth Clinic, Ltd.*, 413 F.3d 786 (8th Cir. 2005), and *Graphic Communications International Union v. Case-Hoyt Corp.*, No. 95-CV-1624 RSP/DS, 1997 WL 610765 (N.D.N.Y. Sept. 25, 1997) — are not to the contrary. In *Duluth Clinic*, the arbitration clause of the CBA required only that alleged violations of the CBA be arbitrated. Because the employer was not accused of violating the CBA — but instead was accused of violating a side agreement that was not part of the CBA — the Eighth Circuit held that the employer was not required to arbitrate. 413 F.3d at 789-90. Here, by contrast, the arbitration clause of the CBA requires the parties to arbitrate "any dispute with reference to the interpretation, application *or* breach of any of the terms contained in this [CBA]," CBA, Art. 31, § 1 (emphasis added) — a much broader clause than the clause at issue in *Duluth Clinic*. As explained above, the dispute over the existence of the last-chance agreement is plainly a "dispute with reference to the interpretation . . . of any of the terms contained in [the CBA]," and thus falls squarely within the scope of the CBA's arbitration clause.

The arbitration clause in *Case-Hoyt* was identical to the arbitration clause in this case. It, too, required arbitration of "'any dispute with reference to the interpretation, application, or breach of any of the terms contained in this [CBA].'" 1997 WL 610765, at *3. But the dispute in *Case-Hoyt* was about whether the employer had violated a settlement agreement with the union. There is no indication in *Case-Hoyt* that resolving that dispute involved the "interpretation" or "application" of any term of the CBA. That distinguishes *Case-Hoyt* from this case, in which resolving the dispute over the formation of the last-chance agreement inevitably requires the interpretation of the CBA.

-12-

Another case relied on by WGA — *Crown Cork & Seal v. International Association of Machinists & Aerospace Workers*, 501 F.3d 912 (8th Cir. 2007) — is also distinguishable. The question in *Crown Cork* was whether, under the terms of a CBA that had expired, the employer was required to arbitrate a grievance over the employer's decision to modify the health benefits of retirees. Whether the employer was required to arbitrate the grievance turned on whether the health benefits of the retirees had vested. If they had vested, the employer was required to arbitrate; if they had not vested, the employer was not required to arbitrate.

The dilemma in *Crown Cork* was that the underlying dispute was also about whether the health benefits of the retirees had vested — and thus a court could not decide whether the dispute had to be *arbitrated* without first deciding the *dispute itself*. On the one hand, as the Eighth Circuit noted, "'the question of arbitrability — whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance — is undeniably an issue for judicial determination.'" 501 F.3d at 917 (quoting *AT&T Techs., Inc.*, 475 U.S. at 649). On the other hand, as the Eighth Circuit also noted, "'in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims.'" *Id.* (quoting *AT&T Techs.*, 475 U.S. at 649). The Eighth Circuit held, in essence, that when these two principles come into conflict, the former trumps the latter:

> . . . [A] court cannot avoid its duty to decide whether a dispute is arbitrable merely because doing so will require the court "to interpret a provision of a bargaining agreement." . . . We see no way to avoid examining and interpreting language in the Master Agreements (including the documents they incorporate) in order to determine if the retiree health benefits vested under the terms of those agreements such that Crown cannot undertake to unilaterally modify the retiree health plans, notwithstanding that deciding the vesting issue answers the question that would otherwise go before

> the arbitrator. In this case, we believe that "the judicial
> responsibility to determine arbitrability takes precedence over the
> general rule to avoid consideration of the merits of a grievance."

*Id.* (citations omitted).

In this case, however, the Court is not forced to "address[] the merits of an underlying dispute in order to determine arbitrability." *Id.* To decide the arbitrability of the dispute over the existence of the last-chance agreement, the Court need not address the merits of that dispute — i.e., the scope of Ollig's authority under the CBA. Rather, the Court need only interpret the arbitration clause in the CBA, which requires that disputes over the meaning of terms in the CBA — such as the dispute over the scope of Ollig's authority — be arbitrated. After the arbitrator makes her decision, the Court will be able to decide whether the dispute over Johnson's firing needs to be arbitrated — and, again, the Court will be able to make that decision without addressing the merits of the decision to fire Johnson. In *Crown Cork*, the Eighth Circuit acknowledged that, if a court can "manage[] to decide the question of arbitrability without getting to the merits," the court should do so. *Id.* That is precisely what the Court has done in this case.

The cases that WGA cites involving last-chance agreements are also inapposite. In both *Boise Cascade Corp. v. Paper Allied-Industrial, Chemical & Energy Workers (PACE) Local 7-0159*, 309 F.3d 1075 (8th Cir. 2002), and *Coca-Cola Bottling Co. v. Teamsters Local Union No. 688*, 959 F.2d 1438 (8th Cir. 1992), an employee working under a last-chance agreement was fired. Everyone agreed that the legality of the firing had to be arbitrated. The arbitrator found that the employee's termination was not authorized by the last-chance agreement, and the employer sought judicial review of the arbitrator's decision. The Eighth Circuit, applying well-

settled law regarding the scope of judicial review of an arbitrator's decision, vacated the arbitrator's decision because it failed to draw its essence from the last-chance agreement. Neither *Boise Cascade* nor *Coca-Cola* has anything to do with this case, which does not involve the review of an arbitrator's construction of a last-chance agreement, but instead involves the question of whether a court or an arbitrator should decide whether a last-chance agreement even exists.

In sum, the parties disagree about whether a binding last-chance agreement was formed. Resolving the parties' disagreement requires defining the scope of Ollig's authority, and defining the scope of Ollig's authority requires interpreting the terms of the CBA. The parties agreed to arbitrate any dispute involving the interpretation of the terms of the CBA. The Court will order the parties to honor their agreement and arbitrate the question of whether the Union is bound by the last-chance agreement.[3] After the arbitrator issues a decision, the parties may ask this Court to decide whether, in light of the arbitrator's decision, the dispute over Johnson's firing must be arbitrated.

### B. Motion to Dismiss

### 1. Standard of Review

In reviewing a Rule 12(b)(6) motion, a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Aten v. Scottsdale Ins. Co.,* 511 F.3d 818, 820 (8th Cir. 2008); *Maki v. Allete, Inc.,* 383 F.3d 740, 742

---

[3]In the arbitration, WGA may raise as a defense the fact that neither the Union nor Johnson grieved the last-chance agreement at the time it was executed. The failure-to-grieve defense is a "jurisdictional challenge of a procedural nature" and should be decided by the arbitrator. *See Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084, 1099 (8th Cir. 2004).

(8th Cir. 2004); *Mattes v. ABC Plastics, Inc.,* 323 F.3d 695, 697 (8th Cir. 2003). Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

2. WGA's State-Law Claims Against Ollig and the Union

WGA alleges that, if Ollig did *not* have authority to sign the last-chance agreement on behalf of the Union, then Ollig committed fraud or negligent misrepresentation when he conveyed "that [he] had authority to agree, and was agreeing, to the [last-chance agreement] on behalf of the Union." Counterclaim ¶ 28. WGA further alleges that it would not have agreed to retain Johnson after the November 6, 2008 incident if the Union, through Ollig, had not agreed to the last-chance agreement. Counterclaim ¶ 29. WGA brings state-law claims against Ollig for fraud and negligent misrepresentation and against the Union based on a theory of respondeat superior. Counterclaim Counts I, II, and III.

The Court agrees with the Union that WGA's state-law claims are preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. That section provides in relevant part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). In *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957), the Supreme Court held that § 301 does not merely give federal courts jurisdiction over actions alleging violations of CBAs, but also authorizes federal courts to "fashion from the policy of our

national labor laws" a body of federal law to govern § 301 actions. *Id*. at 456. To ensure uniformity within this body of law, federal law — and not state law — must be used in adjudicating § 301 claims. *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962).

Accordingly, state-law claims that are based on rights or obligations created by a CBA are preempted under § 301. *Id*. at 104. Likewise, when the resolution of a state-law claim is "substantially dependent upon" the interpretation of a CBA, *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985), "the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles — necessarily uniform throughout the Nation — must be employed to resolve the dispute," *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988).

WGA argues that adjudicating its state-law claims would not require an interpretation of the CBA, and thus those claims are not preempted by § 301. *See Luecke v. Schnucks Markets, Inc.*, 85 F.3d 356 (8th Cir. 1996); *Local 447 of the Int'l Union of Painters and Allied Trades v. Five Seasons Paint & Drywall, Inc.*, 426 F. Supp. 2d 982, 1000 (S.D. Iowa 2006). In the alternative, WGA argues that adjudicating its state-law claims would require, at most, a mere consultation of the CBA — rather than an interpretation of the CBA — and thus those claims are not preempted. *Livadas v. Bradshaw*, 512 U.S. 107, 124-25 (1994).

WGA is incorrect. To adjudicate the question of whether Ollig committed a tort in representing that he had authority to bind the Union, the Court would necessarily have to decide whether Ollig *did* have authority to bind the Union. Obviously, if Ollig had such authority, he would not have committed fraud or negligent misrepresentation. As the Court has explained at length, determining whether Ollig had authority to bind the Union would require the

interpretation of several terms of the CBA. Among other questions, the Court would have to decide what Section 1 of Article 32 meant in describing Ollig as a "representative of the Union," what Section 2 of Article 32 meant in providing that Ollig "shall represent the Union in the plant where he is employed," whether the scope of Ollig's authority to act on behalf of the Union was limited by the fact that Section 2 assigned to Ollig the responsibility to "try to maintain harmonious relations" in the WGA plant, and whether limitations on the scope of Ollig's authority were implied by the last sentence of Section 2 (which requires that "an Officer of the Local Union shall be called in" when, after Ollig brings a dispute to WGA's attention, "satisfaction of the dispute is not accomplished").

Because resolution of WGA's state-law claims would be "substantially dependent upon" an interpretation of the CBA, those state-law claims are preempted by § 301 of the LMRA. *Allis-Chalmers*, 471 U.S. at 220.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion of plaintiff International Brotherhood of Teamsters, Graphic Communications Conference, Upper Midwest Local 1-M and third-party defendant Michael Ollig to dismiss the counterclaim brought by defendants Walter G. Anderson and Associates, Inc.; Walter G. Anderson, Inc.; WALTER G. ANDERSON, INC.; and Walter G. Anderson Printers-Lithographers; and the third-party complaint brought by third-party plaintiff Walter G. Anderson, Inc.,

[Docket No. 5] is GRANTED. The counterclaim and third-party complaint are DISMISSED WITH PREJUDICE AND ON THE MERITS.

2. The motion of plaintiff International Brotherhood of Teamsters, Graphic Communications Conference, Upper Midwest Local 1-M and third-party defendant Michael Ollig for summary judgment [Docket No. 5] is GRANTED IN PART and DENIED IN PART as follows:

   a. The motion is GRANTED insofar as it seeks an order from the Court compelling defendants to arbitrate the question of whether the Union is bound by the last-chance agreement; and

   b. The motion is DENIED in all other respects.

3. The parties are ORDERED to arbitrate the question of whether the Union is bound by the last-chance agreement executed on November 11, 2008.

Dated: September 20, 2010            s/Patrick J. Schiltz
                                     Patrick J. Schiltz
                                     United States District Judge